FILED

11/21/2018

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 3, 2018

IN RE CAMDON H.[1]

Appeal from the Juvenile Court for Jefferson County
No. 15-00926    Dennis Roach, II, Judge

_____

No. E2017-02311-COA-R3-PT

_____

This action involves the termination of a mother's and father's parental rights to their minor child. Following a bench trial, the court found that clear and convincing evidence existed to support the statutory grounds of abandonment for failure to support, to visit, and to provide a suitable home; substantial noncompliance with the permanency plan; and the persistence of conditions which led to removal. The court further found that termination was in the best interest of the child. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and BRANDON O. GIBSON, J., joined.

Weston A. Gantte, Dandridge, Tennessee, for the appellant, Kimberly J.

Brett J. Bell, Dandridge, Tennessee, for the appellant, Richard H.

Herbert H. Slatery, III, Attorney General & Reporter, and Brian A. Pierce, Assistant Attorney General, Nashville, Tennessee, for the appellee, State of Tennessee, Department of Children's Services.

Mindy Norton Seals, Morristown, Tennessee, guardian ad litem for the minor.

---

[1] This court has a policy of protecting the identity of children in parental rights termination cases by initializing the last name of the parties.

**OPINION**

## I.     BACKGROUND

Camdon H. ("the Child") was born to Kimberly J. ("Mother") and Richard H. ("Father") in May 2010. Mother and Father (collectively "the Parents") never married; however, Father was listed on the birth certificate and acknowledged the Child as his biological son. The Parents lived together with the Child and other family members. On November 18, 2014, law enforcement attempted to serve a capias on Father for unpaid child support for another child. Father fled and was later arrested. Mother was also arrested for filing a false police report. Father tested positive for methamphetamine and admitted morphine use for a back injury. Mother also tested positive for methamphetamine two days following her arrest. A search of the home revealed drug paraphernalia and unsanitary living conditions. Accordingly, the Tennessee Department of Children's Services ("DCS") removed the Child.

The Parents waived the adjudicatory hearing, and the court adjudicated the Child as dependent and neglected based upon "substance abuse issues."[2] The Parents agreed with the development of the first permanency plan, entered on December 18, 2014. Revised plans were later entered on August 17, 2015; February 8 and August 1, 2016; and January 17, 2017. The plans contained the following requirements for each parent: (1) honestly complete an alcohol and drug assessment, supply a copy of the removal order to the evaluator, and follow recommendations; (2) sign releases of information; (3) provide DCS with certificates of completion and other relevant treatment documentation; (4) submit to random drug screens; (5) take prescribed medication as directed and submit to pill counts; (6) participate in parenting classes; (7) submit to hair follicle testing; (8) complete a mental health evaluation; (9) resolve legal issues by following rules of probation and pay all fines and fees to avoid further charges; (10) obtain and maintain suitable housing; (11) obtain reliable transportation; (12) remit child support; and (13) visit four hours per month. These plans were ratified by the trial court. Additionally, the Parents signed the Criteria and Procedures for Termination of Parental Rights.

The Parents relocated to Massachusetts around December 31, 2014, and made approximately four trips to visit the Child. The Parents tested positive for opiates in January 2015 and violated their probation in March 2015. Their last visit with the Child occurred on April 8, 2015. They subsequently moved to Vermont in August 2015 without informing DCS. Thereafter, the Parents claimed that they had obtained housing

---

[2] DCS also alleged severe abuse based upon possible exposure to methamphetamine and a report of methamphetamine residue found on the Child's clothing. This report was later unfounded, and DCS withdrew the allegation.

and provided a copy of their current lease to DCS. DCS submitted an Interstate Compact on the Placement of Children ("ICPC") request to assess the suitability of the residence.

DCS filed a petition to terminate each parent's parental rights on October 16, 2015, based upon the statutory grounds of abandonment for failure to remit support, to visit, and to provide a suitable home; substantial noncompliance with the permanency plan; and the persistence of conditions which led to removal. The case proceeded to a hearing on May 19, 2017, and concluded on September 15. At that time, the Parents had not visited the Child for approximately two years and had only maintained contact through weekly telephone calls and video chats, lasting approximately 10 to 25 minutes in duration. The Parents also failed to remit child support during the relevant time period and only began remitting payments two months after the termination petition was filed.

Father testified at the hearing via telephone. He explained that he had not visited the Child since April 2015 because he was attempting to complete the other requirements in the permanency plan. He claimed that they moved to Vermont to facilitate his entry into a treatment program. Once enrolled in a program, he was required to complete six weeks of intensive outpatient classes that required perfect attendance. He stated that a trip from Vermont to Tennessee for visitation cost them "at least" $1,000 per visit. He claimed that they were not advised that he could receive financial assistance for travel until the case was transferred to a different worker after the pertinent time period. He provided that they maintained contact with the Child via telephone and claimed that their interactions were "excellent."

Relative to employment, Father agreed that he obtained part-time employment while in Massachusetts and that he worked for his uncle for approximately six months after they moved to Vermont. He then enrolled in school and obtained employment at the school. He currently works at a modular homes manufacturing company. He stated that he began remitting child support payments in December 2015. He acknowledged that he did not remit child support during the relevant time period but claimed that he provided other items for the Child's care and that he was required to pay his court fines and costs and to obtain housing and transportation in accordance with the permanency plan. He further claimed that he was receiving treatment for drug addiction in August 2015 and was enrolled in three different programs at that time.

Relative to housing, Father testified that they lived with his uncle for approximately six months before moving into their own residence in Vermont in May or June 2016. He stated that they had room for the Child in their current residence that he believed was clean and appropriate for the Child. He further claimed that his prior residence was also suitable for the Child.

Father testified that he completed his required assessments in Massachusetts and then completed additional assessments in Vermont after DCS rejected the initial assessments. He has also since completed his intensive outpatient treatment, obtained full time employment, enrolled in school to become a drug and alcohol counselor, renewed his driver's license, and began remitting child support. He is in counseling, attending narcotics anonymous meetings, and enrolled in parenting classes. He agreed that he was still receiving treatment from a methadone clinic but claimed that they would begin "tapering off" the methadone after the recommended two-year period. He further claimed that he remitted payment on his fines and fees and that his violation of probation for non-payment was resolved in December 2016.

Foster Mother testified that the Child has been residing in her home since January 2015. She confirmed that he was transferred there from his first placement as a result of disruptive behaviors. She believed he had adjusted well and bonded to her other children, one biological child and three adopted children. She expressed love for the Child and indicated her and her husband's desire to adopt him. She confirmed their employment and ability to provide for the Child.

Foster Mother testified that the Child exhibits some disruptive behavior at home and in school and that she is waiting for a referral to a physiatrist to address behavioral concerns. She supervised the Child's weekly telephone calls with the Parents. She agreed that the Child was excited to speak with the Parents but claimed that he was easily distracted. She acknowledged that the Parents provided needed items and presents for the Child. She stated that the Parents have provided more items in the last six months than when the Child was first placed in her home.

Mother testified that her home was not in disarray at the time of the Child's removal. She claimed that the pictures presented were inaccurate. She acknowledged that she was arrested at the time of removal, that she pled guilty to and was placed on probation for misdemeanor evading arrest, and that she later violated her probation for non-payment of fines in March 2015.

Mother testified that she worked for a temp agency in Massachusetts and that Father also obtained employment while in Massachusetts. She stated that she then obtained employment in Vermont in May 2015 and has been continuously employed since that time. She agreed that she did not remit child support until December 2015. She explained that they were funding trips to visit with the Child and then working to establish a home prior to that time. She provided that Father was unable to work because he was attempting to secure placement in a treatment program. She agreed that she could have financially supported the Child had she not supported Father but claimed she could not have mentally made that choice. She further claimed that she still had to establish

suitable housing, find transportation, and pay fines during that time. She agreed that she could have progressed more quickly had she not financially provided for Father. She noted that the child support order was not entered until October 28, 2015, after the filing of the termination petition. She stated,

> I provided [support] with objects instead of cash to the State - - of support. I have not been through this before so I don't know about the specific procedures of child support. I knew that we had a court date to establish for it, and I thought that's when the child support was actually established, how much it was, and [when] it started.

Mother testified that she completed her assessments in Massachusetts but that DCS advised her to obtain new assessments because her answers provided in the assessment were inadequate. She had not yet completed new assessments as directed. She acknowledged that she failed a drug screen and tested positive for opiates on January 28, 2015, but she explained that she was taking Percocet as prescribed and simply did not have her prescription with her and was never asked to provide it. She conceded that she had not submitted to a hair follicle test because she did not have the funds to complete the test. She noted that tests ranged from $100 to $200. She denied any issues with drug abuse and claimed that the allegations of her drug use and methamphetamine found on the Child were later unfounded. She noted that the same person who erroneously claimed that the Child was positive for methamphetamine residue claimed that Mother's drug screen showed a "thin line" for methamphetamine.

Mother stated that she was unable to visit during the relevant time period due to her financial constraints and explained that each visit cost approximately $800 to $1,000. She was never advised that she could receive assistance from DCS for visitation until after the pertinent time period. She provided that she suggested relative placements with her cousin in Massachusetts or Father's uncle in Vermont, who was registered as a foster parent. DCS never completed the proper paperwork.

Mother claimed that since the time of removal, she has worked through her financial burdens, established a residence, obtained transportation, maintained employment with benefits and insurance, completed programs, paid her fines and fees, resolved her legal issues, was current on her child support obligation, and has been attending counseling and parenting sessions with a counselor since February 2017. She explained that they were unable to find parenting classes in their area but that they address parenting issues in their counseling sessions. She noted that she has paid for video equipment to Skype with the Child and that she did not receive assistance from DCS in completing her requirements on the permanency plans.

Mother testified that the Child loves his video chats with them and that he also receives e-mails from Foster Mother with pictures sent at the Child's request. She stated that her residence was suitable for the Child and that she could easily add him to her health insurance through her company. She confirmed Father's progress following his completion of drug treatment and stated that he is now healthy, has more energy, and exhibits a great work ethic. She further claimed that he has assumed his parental responsibilities with his other biological child and exhibited appropriate behaviors. She noted that he also enjoyed a bond with the Child prior to removal and believed that their bond could be reestablished.

The record reflects that the Child's case cycled through three family services workers, Katie Ferguson, who served from the time of removal through July 2016, Jamie Salley, who served from August 2016 through February 2017, and Colleen Dunlap, the current worker. Ms. Ferguson testified at the hearing that she informed the Parents of their eligibility for public housing assistance and the requirements necessary to establish a suitable home. She also submitted a letter on their behalf in an attempt to assist them in securing said housing. The Parents advised her that they alternated between two residences with relatives but that they believed the homes were suitable. Ms. Ferguson advised them that the situation was untenable for a child and that she could not seek placement until they established one full-time residence for the Child. She recalled that the Parents eventually settled into a residence but that she did not request an ICPC because they had not yet completed the majority of the requirements in the permanency plan. She did not pursue a relative placement with the maternal relative because he reported that he was no longer interested. She provided that they also did not pursue a relative placement with the paternal relative because the Child did not have a relationship with him and had already bonded with a foster family.

Ms. Ferguson recalled that Father reported that he secured employment with a family member doing home repairs while in Massachusetts and was working in June 2015. She stated that she facilitated monthly visitation for the Parents while they resided in Massachusetts. She acknowledged that the Parents maintained contact with the Child through weekly telephone calls after their last visit in April 2015. She advised them to continue in-person visitation but could not recall whether she advised them of the process to request aid to facilitate visitation. She explained that DCS will provide gas cards for the purposes of visitation but that she could not mail the cards because the parents are required to pick up the card in person and then submit all receipts.

Relative to the permanency plan, Ms. Ferguson explained,

I took them to their first probation appointment [in Tennessee]. I also aided in the visitation.

- 6 -

After that I tried to communicate as thoroughly as I could with their providers that were out of state. But given that they were in Massachusetts and Vermont, it's very difficult for me to connect with providers and to help provide services, because I'm not only not familiar with those agencies and services but I don't have connections there. So the best that I could do out of state was helping to gather documentation, provide information to the providers that they were trying to work with or were working with and then just confirm services.

She acknowledged that she advised the Parents to obtain new assessments because she did not feel like they provided honest answers based upon her knowledge of the case and their circumstances. She learned of their move to Vermont 10 days before she left the case. She believed that at the time of the filing of the termination petition, the Parents continued to have the same problems they had at the time of removal. She explained that the Parents continued to evidence instability and were unable to provide permanency.

Relative to the Child, Ms. Ferguson believed that the initial in-person visits were successful and that she witnessed a bond between the Parents and the Child. She stated that the Child later evidenced a bond with his foster family and that he no longer seemed as excited to see the Parents or talk with them. She explained that he avoided the subject of the Parents and that the phone calls became difficult. She agreed that the Parents sent clothing, toys, and presents for the Child and attempted to provide other needed items.

Ms. Dunlap testified that an ICPC request for the Parents' residence had already been submitted by Ms. Salley when she was assigned to the case in March 2017.[3] She noted that the process was not yet complete. She described the Parents as evasive and claimed that they were reluctant to provide the requested documentation. She admitted that some of the documentation requested had already been provided before her involvement and that the main requirement left was the establishment of stable housing. She agreed that an ICPC request had been submitted and that the Parents had no control over the completion of the report. She has also not received proof of Father's drug screens completed in Vermont, Mother's hair follicle test, and Mother's second alcohol and drug assessment as requested by Ms. Ferguson.

Ms. Dunlap testified that she facilitates the video calls between the Parents and the Child. She provided that the calls last for approximately 10 minutes before the Child becomes "somewhat defiant" and wants to do something else. She claimed that the Child

---

[3] Ms. Salley confirmed that the Parents provided proof of a rental agreement and that she then submitted the ICPC request to confirm the suitability of the residence. She could not recall the exact date of the submission of her request.

was doing well in his foster home and that a change in caregivers would be "very hard on him" at this point.[4]  She acknowledged that the Child still has a relationship with the Parents but claimed that he no longer refers to them as "mom" or "dad."  She agreed that the Parents send care packages on a monthly basis.

The trial court granted the termination petition, sustaining each ground alleged, and further found that termination was in the best interest of the Child.  This timely appeal followed.

## II.    ISSUES

We consolidate and restate the issues on appeal as follows:

A.    Whether clear and convincing evidence supports the court's termination based upon a finding of abandonment for failure to visit pursuant to Tennessee Code Annotated section 36-1-102(1)(A)(i).

B.    Whether clear and convincing evidence supports the court's termination based upon a finding of abandonment for failure to remit child support pursuant to Tennessee Code Annotated section 36-1-102(1)(A)(i).

C.    Whether clear and convincing evidence supports the court's termination based upon a finding of abandonment for failure to provide a suitable home pursuant to Tennessee Code Annotated section 36-6-102(1)(A)(ii).

D.    Whether clear and convincing evidence supports the court's termination based upon a finding of substantial noncompliance with the permanency plan pursuant to Tennessee Code Annotated section 36-1-113(g)(2).

E.    Whether clear and convincing evidence supports the court's termination based upon the persistence of conditions which led to removal pursuant to Tennessee Code Annotated section 36-1-113(g)(3).

F.    Whether clear and convincing evidence supports the court's finding that termination was in the best interest of the Child pursuant to Tennessee Code Annotated section 36-1-113(i).

---

[4] Ms. Salley confirmed this fact and stated that any change at this point would be a drastic change that could set him back.

## III. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

While parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination. *In re Drinnon*, 776 S.W.2d at 97. A parent's rights may be terminated only upon

> (1)    [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

> (2)    [t]hat termination of the parent's or guardian's rights is in the best interest[] of the child.

Tenn. Code Ann. § 36-1-113(c). "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable. *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug. 13, 2003). This evidence also eliminates any serious or substantial doubt about the

correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2016, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016) (internal citations omitted).

## IV.    DISCUSSION

The Parents did not appeal the statutory grounds supporting the court's termination decision. In such cases, our Supreme Court offered the following instruction:

> [I]n an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal.

*In re Carrington H.*, 483 S.W.3d at 525-26 (internal citation and footnote omitted). Accordingly, we will briefly review each ground in turn.

## A. & B.

In terminating each parent's parental rights based upon the statutory ground of abandonment for failure to visit and to remit support, the court considered the four months preceding October 16, 2015, the filing date of the termination petition. The relevant time period was July 16, 2015, through October 15, 2015.[5]

A parent's willful failure to support "means the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). Token support is "support, under the circumstances of the individual case, [that] is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B). A parent's willful failure to visit "means the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). Token visitation is "visitation, under the circumstances of the individual case, [that] constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(1)(C).

This court has consistently held that the term willfulness as it applies to a party's failure to visit or remit support must contain the element of intent. *In re Swanson*, 2 S.W.3d 180, 188-89 (Tenn. 1999). The element of intent utilized in termination proceedings "does not require the same standard of culpability as is required by the penal code." *In re Audrey S.*, 182 S.W.3d at 863. "Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent." *Id.* "[A] person acts 'willfully' if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing." *Id.* at 863-64.

### 1.

The record reflects that the Parents failed to visit during the requisite time period. The Parents claimed at the hearing that their ability to visit was hampered by their financial condition and attempt to complete the permanency plan requirements; however, each parent admitted employment before, during, and after the relevant time period. Yet, the Parents last visited the Child in April 2015, more than two years prior to the termination petition. The Parents alleged that they maintained contact through telephone calls and video chats. Such contact is not a substitute for in-person visitation as required by statute. With these considerations in mind, we conclude that there was clear and

---

[5] "The applicable four month window . . . includes the four months preceding the day the petition to terminate parental rights is filed but excludes the day the petition is filed." *In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014).

convincing evidence to establish that each parent abandoned the Child by failing to visit during the requisite time period.

2.

The record reflects that the Parents failed to remit child support during the requisite time period. The Parents claimed at the hearing that the child support order was not entered until after the filing of the termination condition and that their ability to remit support was hampered by their financial condition during the relevant time period. "A parent's obligation to support his or her child exists regardless of a court order requiring the parent to pay support." *In re Jacob M.J.*, 434 S.W.3d 565, 572 (Tenn. Ct. App. 2013) (citation omitted). Furthermore, "[e]very parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children." Tenn. Code Ann. § 36-1-102(1)(H).

"'Failure to support a child is 'willful' when a person is aware of his or her duty to support, has the capacity to provide the support, makes no attempt to provide the support, and has no justifiable excuse for not providing the support.'" *In re M.L.D.*, 182 S.W.3d 890, 896 (Tenn. Ct. App. 2005) (quoting *In re Adoption of T.A.M.*, No. M2003-02247-COA-R3-PT, 2004 WL 1085228, at *4 (Tenn. Ct. App. May 12, 2004)). Here, the Parents each admitted employment during the relevant time period but failed to provide any financial support until after the termination petition was filed. "Abandonment may not be repented of . . . subsequent to the filing of any petition seeking to terminate parental or guardianship rights or seeking the adoption of a child[.]" Tenn. Code Ann. § 36-1-102(F). While the Parents provided care packages throughout the case, these packages did not satisfy their support obligation. With all of the above considerations in mind, we conclude that there was clear and convincing evidence to establish that each parent abandoned the Child by failing to remit support during the requisite time period.

C.

A parent may be found to have abandoned his or her child by failing to establish a suitable home. The relevant statutory provision provides, in pertinent part, as follows:

> The child has been removed from the home of the [parent] as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child [ ], and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the

child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the [parent] to establish a suitable home for the child, *but that the [parent has] made no reasonable efforts to provide a suitable home and [has] demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date.* The efforts of the department or agency to assist a [parent] in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the [parent] toward the same goal, when the [parent] is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(ii) (emphasis added). Termination for failure to provide a suitable home requires a finding, supported by clear and convincing evidence that a parent failed to provide a suitable home for his or her child even after DCS assisted that parent in his or her attempt to establish a suitable home. Tenn. Code Ann. § 36-1-102(1)(A)(ii).

The record reflects that DCS expended some efforts in aiding the Parents in their search for suitable housing in the four months following removal and that the Parents actually established a residence and had maintained said residence for some time prior to the termination hearing. However, the court found clear and convincing evidence to support this ground because Mother failed to properly address questions concerning her drug usage. Further, neither parent completed a hair follicle test as required. The court reasoned that any home established together by them at the time of the termination hearing was unsuitable due to ongoing concerns regarding possible drug usage. The court noted that Mother's last drug test was positive for opiates. We agree. The Child was removed, in part, due to the Parents' alleged drug usage. Mother was less than willing to establish her sobriety through the recommended assessments and tests, and Father was still dependent upon methadone at the time of the hearing. Accordingly, we conclude that there was clear and convincing evidence to establish that each parent abandoned the Child by failing to provide a suitable home at the time of the hearing.

D.

Tennessee law requires the development of a plan of care for each foster child and further requires that the plan include parental responsibilities that are reasonably related to the plan's goal. Tenn. Code Ann. § 37-2-403(a)(2)(A). A ground for termination of parental rights exists when a petitioner proves by clear and convincing evidence that "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan." Tenn. Code Ann. § 36-1-113(g)(2). To

establish noncompliance, the trial court must initially find "that the requirements of the permanency plans are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *In re M.J.B.*, 140 S.W.3d at 656; *see In re Valentine*, 79 S.W.3d at 547. When the trial court does not make such findings, the appellate court should review the issue de novo. *In re Valentine*, 79 S.W.3d at 547. Second, the court must find that the parent's noncompliance is substantial, *In re M.J.B.*, 140 S.W.3d at 656, meaning that the parent must be in "noncompliance with requirements in a permanency plan that are reasonable and related to remedying the conditions that warranted removing the child from the parent's custody." *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *12 (Tenn. Ct. App. June 3, 2003). To assess a parent's substantial noncompliance with a permanency plan, the court must weigh "both the degree of noncompliance and the weight assigned to that particular requirement." *Id.* at *12. Conversely, "[t]erms which are not reasonable and related are irrelevant, and substantial noncompliance with such terms is irrelevant." *In re Valentine*, 79 S.W.3d at 548-49.

Here, the permanency plans required each parent to (1) honestly complete an alcohol and drug assessment, supply a copy of the removal order to the evaluator, and follow recommendations; (2) sign releases of information; (3) provide DCS with certificates of completion and other documentation; (4) submit to random drug screens; (5) take prescribed medication as directed and submit to pill counts; (6) participate in parenting classes; (7) submit to hair follicle testing; (8) complete a mental health evaluation; (9) resolve legal issues by following rules of probation and pay all fines and fees to avoid further charges; (10) obtain and maintain suitable housing; (11) obtain reliable transportation; (12) remit child support; and (13) visit four hours per month.

At the time of the hearing, each parent exhibited some compliance with the permanency plan requirements. Our review of the record reveals that Father's compliance must be considered substantial when he completed the secondary assessments as required, resolved his legal issues, obtained employment and transportation, was remitting child support, and showed great improvement in his effort to combat his drug addiction. Mother's compliance was less than substantial when she failed to complete new assessments and to adequately address concerns relating to her possible drug usage. With these considerations in mind, we conclude that there was clear and convincing evidence to establish that Mother failed to substantially comply with the requirements of the permanency plan but that the court erred in terminating Father's parental rights on this ground. Reversal is not warranted because only one statutory ground is required to support the court's termination decision. Tenn. Code Ann. § 36-1-113(c).

E.

Under Tennessee law, a court may terminate parental rights when:

(3)     The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A)     The conditions that led to the child's removal *or other conditions* that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(B)     There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C)     The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3) (emphasis added).  Termination of parental rights requires clear and convincing evidence of all three factors. *In re Valentine,* 79 S.W.3d at 550.  Additionally, the persistence of conditions ground may only be applied "where the prior court order removing the child from the parent's home was based on a judicial finding of dependency, neglect, or abuse." *In re Audrey S.,* 182 S.W.3d at 874.  Given Mother's failure to address her possible substance abuse issues and Father's continued dependency on methadone, we conclude that that there is little likelihood that the conditions which led to removal will be remedied *at an early date* so that the Child can be safely returned in the near future and that the continuation of the relationship greatly diminishes the Child's chances of early integration into a safe, stable and permanent home.  Accordingly, we conclude that the conditions which led to removal still persist.

F.

Having concluded that there was clear and convincing evidence supporting at least one statutory ground of termination, we must consider whether termination was in the best interest of the Child.  In making this determination, we are guided by the following non-exhaustive list of factors:

- 15 -

(i)    In determining whether termination of parental or guardianship rights is in the best interest of the child . . . the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;[6]

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

---

[6] *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015) ("[I]n a termination proceeding, the extent of DCS's efforts to reunify the family is weighed in the court's best-interest analysis, but proof of reasonable efforts is not a precondition to termination of the parental rights of the respondent parent.").

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to [section] 36-5-101.

Tenn. Code Ann. § 36-1-113(i). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interest[] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[] of the child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).

Despite each parent's progress since the time of removal, neither made an adjustment of circumstances necessary for the Child's return or maintained regular visitation with him. Tenn. Code Ann. § 36-1-113(i)(1)-(3). We further hold that DCS's efforts in this case were reasonable given the Parents relocation to a different state. While we agree that the Child maintained a relationship with each parent, we cannot classify such a relationship as meaningful when contact was limited to phone calls and video chats. Tenn. Code Ann. § 36-1-113(i)(4). Testimony indicated that the Child grew tired of these interactions and no longer exhibited a strong bond with the Parents. Moreover, the record unequivocally established that a change of caretakers at this point in the Child's life would be detrimental to his emotional condition. Tenn. Code Ann. § 36-1-113(i)(5). The Child has been in his pre-adoptive home for more than three years now and has bonded with his foster parents who wish to adopt him. He has simply languished in custody for far too long and should be allowed to achieve permanency and stability in his current placement. With all of the above considerations in mind, we conclude that there was clear and convincing evidence to establish that termination of each parent's parental rights was in the best interest of the Child. We affirm the trial court.

## V.    CONCLUSION

The judgment of the trial court is affirmed, and the case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed equally to the appellants, Kimberly J. and Richard H.

_____
JOHN W. McCLARTY, JUDGE